**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re                                                    Chapter 7
**ARNOLD F. GONSALVES**, **JR.,**                          Case No. 09-20091 - JNF
          Debtor
~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the Court is the Expedited Motion for Determination that Severance Pay is Exempt (the "Motion") filed by Arnold F. Gonsalves (the "Debtor"). Through his Motion, the Debtor seeks a determination that his claimed exemption in severance pay is valid pursuant to either 11 U.S.C. § 522(d)(10)(C) or 11 U.S.C. § 522(d)(10)(E). The Trustee, Stephen E. Shamban (the "Trustee"),[1] objected to the Motion. The Court issued a decision on February 23, 2010, *see* <u>In re Gonsalves</u>, No. 09-20091-JNF, 2010 WL 716185 (Bankr. D. Mass. Feb. 23, 2010), in which it determined that an evidentiary hearing was required to determine the Motion and the Objection. The Court conducted that evidentiary hearing on September 15, 2010. Two witnesses testified and three exhibits were introduced into evidence.

The issue presented is whether the Debtor's weekly severance payments that he had

_____

[1]The Court takes judicial notice that the Trustee passed away on November 18, 2010.

1

Case 09-20091   Doc 71   Filed 12/21/10   Entered 12/21/10 09:56:19   Desc Main
Document      Page 2 of 21


a right to receive at the commencement of the case are exempt under either 11 U.S.C. §

522(d)(10)(C) or 11 U.S.C. § 522(d)(10)(E). For the reasons set forth below, the Court

determines that the Debtor's severance benefits are exempt under both 11 U.S.C. §§

522(d)(10)(C) and (E).

## II. PROCEDURAL BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on October 22, 2009. On January 4,

2010, the Debtor filed an "Expedited Motion for Determination that Severance Pay is

Exempt under Section 522(d)(10)(C), d(10)(E)" [sic], although, initially, he did not disclose

the severance payments on Schedule B - Personal Property, or claim them as exempt on

Schedule C - Property Claimed as Exempt. The Court denied the Debtor's Motion for

Determination because he had failed to claim the severance payments as exempt on

Schedule C. *Cf.* In re Church, No. 08-16202-JNF, 2009 WL 3754399 (Bankr. D. Mass. Nov.

3, 2009). The Debtor then filed 1) Amended Schedules B and C, 2) a "Motion to Amend

Schedule B, Schedule C," and 3) a "Motion for Reconsideration of Debtor's Motion for

Determination that Severance Pay is Exempt under Section (D)(1)(C), D (1)(E)" [sic]. On

Amended Schedule B - Personal Property, the Debtor listed "Severance Payments of $880

per week (38 weeks) by Commonwealth Wine and Spirits, Inc." [sic] in the total sum of

$33,440, and, on Amended Schedule C - Property Claimed as Exempt, the Debtor claimed

"Severance payments of $880 per week (38 weeks) by Commonwealth Wine and Spirits,

Inc." [sic] as exempt pursuant to 11 U.S.C. § 522(d)(10)(C) or 11 U.S.C. § 522(d)(10)(E).

The Court granted the Debtor's Motion for Reconsideration, heard the Debtor's

2

Motion and the Trustee's Objection on January 14, 2010 and took the matter under advisement. Both parties filed briefs. Neither party requested an evidentiary hearing, although the Chapter 7 Trustee raised an issue as to whether the Debtor had been offered employment by the company which acquired his employer's business before executing the severance agreement with his former employer. After hearing the Motion on January 14, 2010, the Court determined that an evidentiary hearing was necessary to resolve the issues raised by the Motion and Objection.   Accordingly, based upon the testimony and documentary evidence from the September 15, 2010 hearing, the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## III. FACTS

   A. Background

   The Debtor was employed for approximately 16 years by Commonwealth Wine & Spirits LLC ("Commonwealth"). As a driver with a Commercial Driver's License (a "CDL driver"), he delivered wine and spirits to retail liquor stores, hotels and restaurants.  He earned $22.05 per hour and worked approximately forty hours per week. The Debtor testified that Commonwealth employed twenty-one  CDL drivers.

   On July 10, 2009, Martignetti Companies ("Martignetti") acquired Commonwealth's business. Prior to the acquisition date, Commonwealth employees attended numerous meetings to learn about the transaction and their employment and severance options.  Ms. Deborah C. Gray ("Gray"), an Assistant Vice-President at Martignetti charged with overseeing all compensation, payroll and benefits administration, testified that Martignetti

3

intended to employ approximately half of Commonwealth's non-management and administrative employees.  Gray also testified that she learned from Commonwealth's management that it employed six CDL drivers, a figure consistent with the number of delivery trucks Commonwealth owned.  Both Gray and the Debtor recognized, however, that many of the employees who worked in the warehouse were also CDL drivers and filled in on an as needed basis.

In anticipation of both employment opportunities and layoffs, Gray participated in a meeting with Commonwealth employees on June 17, 2009.  She and the Debtor expressed different views as to what transpired at the meeting.  The parties agreed, however, that Martignetti prepared a document setting forth "Warehouse Additional Staffing Needs," which was distributed at the meeting  That document included the following:

| Position | # of People | Comments |
|----------|-------------|----------|
| **Norwood** | | |
| • Seniority CDL Driver | 6 | Full union benefits<br>Base pay @ $20.75 plus premium $2-3.00 |

The Debtor indicated that the CDL drivers were offered full time union benefits, but were not promised full time jobs.  Gray initially did not deliver an audible response to a direct question as to whether the six CDL drivers identified by Commonwealth were offered employment by Martignetti.  She admitted, however, that the CDL drivers employed by Martignetti generally worked forty hours per week, but sometimes they worked less.  Nevertheless, she subsequently testified that Commonwealth's six CDL

4

drivers were offered full time employment.  The offers, however, were not made directly

to specific individuals at the June 17th meeting.  She added:

> This meeting on the 17th was held early in the morning, and the offer was
> made verbally.  They [the employees] were invited to come to the Martignetti
> facility in Norwood the following Monday morning to have a tour.  Those
> who were interested in employment with Martignetti would have indicated
> to us their interest, and then I would have drawn up an offer letter.

Gray did not know whether the Debtor attended the meeting on Monday morning

in Norwood.  She testified that the Monday meeting was "to give the Commonwealth

employees an opportunity to see the facility, to get a feel for what their commute might be;

and at that time, after the tour and breakfast, they were to indicate their interest in

accepting an offer of employment."  She testified that to her knowledge the Debtor never

applied for employment with Martignetti.  Indeed, none of Commonwealth's CDL drivers

went to work for Martignetti in July of 2009.

The Debtor, along with certain other employees, were offered a severance package.

The severance payments were calculated the same for all eligible employees as follows:

eligible employees would be given eight weeks of severance pay at their final base rate of

pay, plus an additional two weeks pay for every full year of service. The Debtor received

38 weeks of severance pay.  Gray stated that "the severance offer was on the table if the

employees either did not accept the job or didn't qualify for the job."  She added:

> In our offer, in the meeting on June 17th, we offered employment.  We
> offered to let the warehouse and delivery personnel try it out at Martignetti
> for nine months.  If during - - any time during that nine-month period they
> didn't  like it for any reason whatsoever, they could resign and still collect
> their full severance.

Only employees who accepted employment and remained with Martignetti for more than nine months sacrificed the severance payments.

The severance agreement, which was contained in a letter reproduced below, did not state the monetary amount, but the Debtor reported a total sum of $33,440 in his Amended Schedule B, and $880 per week on his Amended Schedule C. Every CDL driver's severance pay was based on the same calculation, and the severance pay was provided in weekly installments.

Following the acquisition, Commonwealth's warehouse closed.  The Debtor was terminated effective July 24, 2009.

B. <u>The Severance Agreement</u>

Commonwealth prepared a letter agreement, dated July 22, 2009, although the parties agreed that the  date which  should have appeared on the letter was June 22, 2009. The Debtor executed the letter agreement on June 26, 2009.  It provided, in pertinent part, the following:

> As you know, the decision has been made to conduct a reduction in force at Commonwealth Wine & Spirits (the "Company") following and contingent upon its acquisition by Martignetti Companies. As a result, if you choose not accept [sic] the offer of employment with Martignetti Companies that was made to you on June 17, 2009, your employment with the Company will terminate on or before July 24, 2009 (the "Separation Date") [sic]. In the unlikely event the acquisition is not consummated, this offer will be null and void and the existing terms of your employment by [sic] will be unaffected.
>
> The purpose of this letter is to confirm the agreement between you and the Company concerning your severance arrangement, as follows:
>
> 1. <u>Final Salary and Vacation Pay</u>. Today you have received pay for the final

6

payroll period of your employment through the Separation Date, to the extent not yet paid, as well as pay, at your final base rate of pay, for any vacation days you had earned, but not used, as of the Separation Date, determined in accordance with Company policy and as reflected on the books of the Company.

2. <u>Severance Benefits</u>. In consideration of your acceptance of this Agreement and subject to your meeting in full the conditions set forth in Section 3, the Company will provide you severance pay, at your final base rate of pay, for the period of thirty-eight (38) weeks following the Separation Date (the "Severance Pay").

3. <u>Conditions to Payment</u>. To be eligible to receive the Severance Pay, you must satisfy all of the following conditions:

> (a) You must sign this Agreement and return it to me no later than June 30, 2009;
> (b) You must not resign your employment with the Company before the Separation Date . . . .
> (d) After the Separation Date  but not later than July 15, 2009 you must sign and return to me the general release of claims attached to this letter as Exhibit A (the "Release"); . . .

4. <u>Form and Timing of Severance Pay</u>. The Severance Pay will be paid in the form of salary continuation in accordance with the Company's normal payroll practices. Payments will begin on the next regular pay day following the Separation Date, provided that you have satisfied all of the conditions described in Section 3.

5. <u>Withholding</u>. All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law and all other deductions authorized by you.

***

If the terms of this Agreement are acceptable to you, please sign, date and return it to me no later than June 30, 2009. When you sign it, this letter will take effect as a legally-binding sealed agreement between you and the Company on the basis set forth above. To receive the Severance Pay described in Section 2 above, you must also satisfy the other conditions set out in Section 3 above, including the requirement that you sign and return

7

to me the Release attached to this letter as Exhibit A, between July 10 and
July 15, 2009.

C. Martignetti's Terms of Employment

According to Gray, if the Debtor had accepted an offer from Martignetti, he would

have lost all seniority as a CDL driver, despite his 16 years with Commonwealth. She

testified that "[t]he routes are put out for bid every day; and depending on your seniority

- - you know, if you're at the top of the seniority list you get to pick first."  Additionally,

she recognized that the Debtor would have been required to join the union, which would

have resulted in a pay reduction for union dues. She viewed union membership positively,

however, as it would guarantee Commonwealth employees certain benefits which they had

not had.  Additionally, the Debtor's base salary would have been reduced by $1.30 per

hour, although there was a premium incentive for larger loads, which was not guaranteed.

The Debtor testified that he did not believe Martignetti's proposal to be a firm offer

of employment, particularly because there was no written offers made at the June 17th

meeting.  Accordingly, the Debtor chose to accept the severance payments.  He also filed

an application for unemployment compensation with the Massachusetts Division of

Unemployment Assistance, which gave Martignetti notice that he had applied. Gray did

not dispute that the Debtor was entitled to unemployment compensation. When Gray was

questioned as to why she did not dispute the Debtor's application for unemployment

compensation, she simply stated that he was entitled to unemployment compensation

because he had accepted the severance payment.

8

Based upon the evidence presented, the Court finds that Martignetti extended an offer of employment to the Debtor, although the Debtor would have been required to attend a meeting in Norwood on June 22, 2009, the Monday following the June 17th meeting and express interest in a CDL position. Had he accepted a position, it would have entailed a reduction in pay, not just because of the lower pay scale but because of deductions for union dues in the amount of approximately $50 per month.[2] Additionally, the Debtor would have lost his seniority, been required to bid for routes, and was not guaranteed a full forty hour week.[3] Gray testified that Martignetti employed six CDL drivers: "We hired six from outside to replace the six that we didn't get." She added: "I know for a fact that we hired recently a Commonwealth driver who had taken his severance and then applied, and we hired him because we needed him." Additionally, had the Debtor accepted a position and then found it to be unacceptable for any reason, he would not have been precluded from obtaining his severance. Nevertheless, the Court further finds that the Debtor may have been confused as to whether Martignetti intended to make firm offers to the CDL drivers because of the absence of any written agreement or direct contact with them on June 17th.

## IV. POSITIONS OF THE PARTIES

---

[2] Together with the reduced pay, the Debtor potentially would have seen a drop of income of over $2,000 per year.

[3] The Court notes that the Debtor, who set forth an address in Seekonk, Massachusetts on his bankruptcy petition also would have had a longer commute from his home in Seekonk to Norwood, Massachusetts. Commonwealth was located in Mansfield, which is significantly closer to Seekonk.

The Debtor maintains that the severance pay is exempt for two reasons. First, he asserts that the severance pay satisfies the provision of 11 U.S.C. § 522(d)(10)(C), as it can be considered an "unemployment benefit." Second, he claims the severance pay can be exempted under provisions of 11 U.S.C. § 522(d)(10)(E), as the payments were made pursuant to a contract on account of length of service and were reasonably necessary for his support.

The Trustee contends that the Debtor is not entitled to exempt the severance pay under either subsection because the benefits were not based on length of service and because Martignetti offered the Debtor a job, demonstrating that the severance pay was not given for unemployment. The Trustee seeks an order that he is entitled to all postpetition severance payments, adding that on January 6, 2010 he received a letter from Commonwealth indicating that it would turnover the payments to which the Debtor was entitled to the Trustee.

Notably, the Trustee did not argue, in the alternative, that if the Debtor received payments on account of length of service those payments were not reasonably necessary for his support in view of his simultaneous receipt of unemployment compensation. Additionally, the Trustee did not argue that payments received by the Debtor prepetition were not exempt. The Trustee focused exclusively on the Debtor's entitlement to postpetition payments.

## V. DISCUSSION

### A. Burden of Proof

10

Pursuant to Fed. R. Bankr. P. 4003(c), the party objecting to a claimed exemption has the burden to prove by a preponderance of the evidence that the debtor is not entitled to the exemption.  The United States Court of Appeals for the Fifth Circuit has summarized the burden of proof as follows:

> Under Fed. R. Bankr.P. 4003(c), "the objecting party has the burden of proving that the exemptions are not properly claimed." Objectors "must establish that the exemption is improper by a preponderance of the evidence." Presto, 376 B.R. at 563. The Ninth Circuit has described the burden shifting framework created by Rule 4003(c) in the following terms:
>
> > A claimed exemption is presumptively valid. . . . Once an exemption has been claimed, it is the objecting party's burden . . . to prove that the exemption is not properly claimed. Initially, this means that the objecting party has the burden of production and the burden of persuasion. The objecting party must produce evidence to rebut the presumptively valid exemption. If the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper. The burden of persuasion, however, always remains with the objecting party.

In re Fehmel, 372 Fed. App'x 507,  511 (5th Cir. 2010) (citing, inter alia, Carter v. Anderson (In re Carter), 182 F.3d 1027, 1029 n. 3 (9th Cir. 1999) (internal quotation marks and citations removed)).

B. Applicable Law

1. Section 522(d)(10) Exemptions

Section 522(d)(10) provides in relevant part:

The following property may be exempted under subsection (b)(2) of this section . . .

11

> (10) The debtor's right to receive - . . .
>
>> (A) a social security benefit, *unemployment compensation*, local public assistance benefit;
>>
>> (C) a disability, illness, or *unemployment benefit* . . .
>>
>> (E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or *contract on account of* illness, disability, death, age, or *length of service*, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor . . . .

11 U.S.C. § 522(d)(10)(A),(C) and (E) (emphasis supplied). "When interpreting a federal statute, courts first examine the plain language of the statute, *see* In re Schena, __ B.R. __, 2010 WL 4026807 (Bankr. D. N.M. Oct. 14, 2010) (citing Consumer Product Safety Commission v. GTE Sylvania, 447 U.S. 102, 108(1980); Dalton v. Internal Revenue Service, 77 F.3d 1297, 1299 (10th Cir.1996)). The plain meaning of the statute will be dispositive, unless contrary to the clear intention of the drafters. *See* United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989). Additionally, in construing the statute, the Court must be aware of the policy that bankruptcy exemptions should be construed liberally in favor of the debtor. *See* In re Christo, 228 B.R. 48, 50 (B.A.P. 1st Cir. 999).

The court in In re Dale, 252 B.R. 430 (Bankr. W.D. Mich. 2000), *aff'd,* 264 B.R. 875 (W.D. Mich. 2001), *rev'd on other grounds*, 43 Fed.Appx. 911 (6th Cir. 2002), discussed section 522(d)(10) exemptions, observing the following:

> Congress limited the exemption to a "right to receive a payment" under a retirement or similar plan and then grouped that exemption with four other categories of benefits. 11 U.S.C. § 522(d)(10)(A)-(D).

12

* * *

These first four subsections share a common theme: each enumerated benefit or right to payment is based upon a condition of the recipient typically associated with immediate need. For example, the elderly and disabled frequently rely upon social security and veterans benefits as their sole means of support. The unemployed depend upon unemployment compensation and the poor depend upon public assistance. A divorced spouse and his or her dependents require alimony or other support for their basic needs, especially if they have no other resources.

What I discern from these other four subsections is a Congressional design to ensure that unemployed or underemployed debtors who depend upon benefits and other payments for their livelihood are offered the same opportunity for a "fresh start" as debtors who are fully employed. Congress, when it enacted the Bankruptcy Code, excluded from the estate's property, all "earnings from service performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6). The exclusion of an individual debtor's post-petition earnings is consistent with Congress' overall scheme of providing a debtor with a "fresh start." The exclusion makes quite clear that the debtor's post-petition earnings may not be attached by a bankruptcy trustee for the benefit of the debtor's creditors, but instead may be preserved for the sustenance of the debtor and his family.

However, the Section 541(a)(6) exclusion of post-petition earnings does not address a separate body of debtors who are equally entitled to a "fresh start"-debtors who sustain themselves from sources other than earnings. Included among such non-wage earning debtors are persons receiving social security, unemployment, and public assistance benefits. These benefits are not future wages but instead are quasi-assets. For example, a retired debtor receiving social security benefits at the time of her bankruptcy petition does not continue to "earn" those benefits post-petition. Her age has already established her eligibility. Similarly, a divorced spouse who is receiving alimony does not "earn" the post-petition support payments. Indeed, post-petition alimony payments arising under a pre-petition divorce judgment are more akin to payments on account of a pre-petition account receivable than to future earnings.

I believe that Congress intended Section 522(d)(10) to ensure that deserving debtors who are receiving non-wage benefits at the time they file for bankruptcy would receive the same treatment as debtors who are employed.

13

> What Congress recognized was that there would be debtors filing for bankruptcy relief who depended upon non-wage payment streams for their livelihood and that many of these debtors needed these benefits as much, if not more, than debtors who could continue to work. It is in this sense that the "benefits" enumerated in Section 522(d)(10) are "akin to future earnings of the debtor."

In re Dale, 252 B.R. at 435-436 (footnotes omitted).

While the court in Dale focused on the purpose of section 522(d)(10) exemptions, the court in In re Wegrzyn, 291 B.R. 2 (Bankr. D. Mass. 2003), observed the difficulty of articulating a meaningful and consistent method of differentiating between benefits falling under § 522(d)(10)(C) and § 522(d)(10)(E) because of "the exemption statute's cryptic and seemingly overlapping and contradictory language."  291 B.R. at 6.  The Wegrzyn court, in the context of a claimed exemption in disability benefits added:

> Section 522(d)(10)'s legislative history adds to the confusion by failing to distinguish between the specific types of property deemed to be fully or partially exempted by the section. The comment to § 522(d)(10) lumps "benefits" and "payments" under a general umbrella definition of "benefit." More importantly, the comments to the section refer to both subsections (C) and (E) as exemptions of disability related "benefits:"

>> Paragraph (10) exempts certain *benefits* that are akin to future earnings of the debtor. These include social security, unemployment compensation, or public assistance benefits, veteran's benefits, *disability*, illness, or unemployment *benefits,* alimony, support, or separate maintenance (but only to the extent reasonably necessary for the support of the debtor and any dependents of the debtor), *benefits under* a certain stock bonus, pension, profitsharing, annuity or *similar plan based on* illness, *disability*, death, age or length of service.

> H.R.Rep. No. 95-595, at 126 (1977), reprinted in 1978 U.S.C.C.A.N. at 6087 (emphasis supplied).

In re Wegrzyn, 291 B.R. at 6.

Turning to the plain language of 11 U.S.C. § 522(d)(10), according to the court in In re Schena, , __ B.R. __, 2010 WL 4026807 (Bankr. D. N.M. Oct. 14, 2010), a case involving a debtor's claimed exemption in a checking account holding military retirement funds, funds due a debtor under § 522(d)(10), lose their exempt character once the debtor receives payment.  Citing In re Cesare, 170 B.R. 37, 39 (Bankr. D. Conn. 1994), the Schena court stated:

> [G]iven the plain meaning, courts have found that the general rule is that "once money from an exempt fund is paid out and placed in a bank account, such money typically loses its exempt status." Anderson, 410 B.R. at 291. Nevertheless, such money retains its exempt status where Congress enacts an explicit statute, such as 42 U.S.C. § 407, to protect certain types of funds even where payment was made pre-petition. Id. Moreover, this plain language interpretation is consistent with construing exemption statutes liberally because it allows debtors to retain the exempt character of exempt property where Congress has provided for such protection in legislation through either federal bankruptcy or non-bankruptcy law. The majority of courts have followed this plain language interpretation of the general rule with respect to "right to receive". In re McCollum, 287 B.R. 750, 753 (Bankr. E.D.Mo. 2002)("The 'right to receive' a benefit has been deemed to have been extinguished when payments or benefits have already been received by a debtor before the bankruptcy case was commenced."); In re Michael, 262 B.R. 296, 298 (Bankr. M.D. Pa. 2001) ("All five subsections of § 522(d)(10) exempt '[t]he debtor's right to receive' the benefits and not the benefits that have already been paid over to the debtor.") (Citation omitted.); In re Panza, 219 B.R. at 97 (Same.); In re Moore, 214 B.R. 628, 631 Bankr.D. Kan.1997)(The "language suggests that the exemption only applies to the right to receive future payments."); In re Williams, 181 B.R. 298, 301 (Bankr. W.D. Mich.1995)(Section 522(d)(10) does not contemplate exemption of traceable assets.); In re Cesare 170 B.R. at 39 ("Under the plain language of [section 522(d)(10) ], then, any funds due a debtor under such a plan or contract lose their exempt character once the debtor receives the funds."); *but see* In re Caslavka, 179 B.R. 141, 147 (Bankr.N.D.Iowa 1995)(interpreting the "right to receive" in a state statute as applying to lump sum payment from a profit sharing plan after rollover into

annuities).

2010 WL 4026807 at *4 (footnote omitted, emphasis supplied).

In <u>In re Panza</u>, 219 B.R. 95 (Bankr. W.D. Pa. 1998), a case involving 11 U.S.C. § 522(d)(10)(C), the court addressed the issue of "whether the exemption set forth at § 522(d)(10)(C) for a debtor's right to receive a disability benefit also applies to funds debtor sets aside prior to the filing of the bankruptcy petition that are directly traceable to such benefit." 219 B.R. at 96. In that case the Chapter 7 trustee argued that § 522(d)(10)(C) does not extend to funds in a savings account received prepetition that are traceable to the right to receive a disability benefit, while the debtor maintained that the funds in the savings account enjoyed the same status under § 522(d)(10)(C) as her right to receive the benefits. <u>Id.</u> Noting a split of authority, the court in <u>Panza</u>, noted that the debtor received periodic disability benefits. The court also noted that those benefits were disclosed as income on Schedule I. The court, however, disallowed the debtor's periodic disability benefits that were set aside prepetition in a savings account, stating:

> Certain of the cases that hold that traceable property is also exempt pursuant to § 522(d)(10)(C) rely on the "general rule" that depositing exempt funds into a bank account does not divest those funds of their exempt status. <u>In re Green</u>, 178 B.R. at 536; <u>In re Williams</u>, 171 B.R. at 453-54.
>
> They also reason that holding otherwise would defeat the purpose of having such exemptions in the first place. Recipients of exempt payments would not be able to put their benefits to practical use if the exemption dissolved upon negotiation of an exempt payment or upon its conversion into funds in a bank account. Creditors would be able to defeat the exemption simply by waiting until a benefit check was converted into cash or funds in a bank account and then attaching or levying upon the account. <u>In re Williams</u>, 171 B.R. at 454.

16

These arguments are not persuasive.

The right to claim an exemption is a statutory creation and is not derived from "equitable" (or other) considerations. If an exemption is not allowed by statute, it is not allowable. In re Clark, 711 F.2d 21, 23 (3d Cir.1983).

The overall structure of § 522(d) of the Bankruptcy Code leads us to conclude that funds in a bank account that are derived from (or traceable to) a right to receive a disability payment are not also exempt by virtue of § 522(d)(10)(C).

Subsections 522(d)(10) and 522(d)(11) differ in a critical respect. Subsection 522(d)(10) speaks only of a "debtor's right to receive" certain types of benefits or payments. Subsection 522(d)(11), by contrast, refers to both a "debtor's right to receive" certain types of benefits and payments as well as "property that is traceable" thereto.

This difference in the language employed leads us to infer that Congress was fully cognizant of the distinction between a "debtor's right to receive" something and "property that is traceable" thereto. We therefore should not construe § 522(d)(10)(C) as encompassing property that is "traceable to" the right to receive periodic disability payments, such as a savings account into which such payments are deposited. Such an interpolation into the text of § 522(d)(10)(C) would be unwarranted. In re Cesare, 170 B.R. at 39; In re Williams, 181 B.R. at 301.

Panza, 219 B.R. at 97 (footnote omitted).  See also In re Sanchez, 362 B.R. 342 (Bankr. E.D. Mich. 2007)("The benefits and other rights exempted under Section 522(d)(10) all represent payment streams that a debtor would expect to receive at regular intervals over some duration of time after his or her bankruptcy case had been commenced. In other words, all the benefits and other rights referenced in Section 522(d)(10) are "akin to future earnings" in the sense that they serve to supplement or replace the regular paycheck that a debtor might have otherwise continued to have received.").  This Court agrees with the rationale employed by the courts in Panza and Sanchez in view of the different language employed

17

by Congress in section 522(d)(10) and section 522(d)(11).

Notably, in the present case, the Trustee is not seeking to recover severance payments received by the Debtor prepetition. Rather, he is seeking the sum of payments to which the Debtor was entitled after the commencement of his bankruptcy case on October 22, 2009. The Trustee apparently concluded that the Debtor did not retain those funds in a separate account or, alternatively, concluded that he could not trace the use of the severance payment to another form of property. Accordingly, the Trustee did not seek an order requiring the Debtor to turnover or disgorge the severance payments that he received between July 24, 2009 and the petition date of October 22, 2009.

2. Law Applicable to Severance Payments

In this Court's prior decision, *see* In re Gonsalves, No. 09-20091-JNF, 2010 WL 716185-JNF (Bankr. D. Mass. Feb. 23, 2010), the Court discussed the pertinent cases with respect to severance benefits. The Court incorporates by reference the discussion from its prior opinion. Following its discussion of existing case law, the Court stated:

> Based upon the case law discussed above, the Court finds that the decision in In re Rock, No. 04-83722, 2005 WL 2061045 (Bankr. D.D. Ill. April 25, 2005) [sic], is the most instructive. Not only is the provision of the Illinois statute identical to section 522(d)(10)(C), the Debtor's schedules and Chapter 7 Statement of Current Monthly Income indicate that he is in need of the "fresh start" afforded honest and unfortunate debtors. *See* Grogan v. Garner, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (discussing the fresh start policy of the Bankruptcy Code). Nevertheless, the existing record contains insufficient facts for this Court to determine whether the Debtor's severance payments are exempt from property of the estate pursuant to 11 U.S.C. § 522(d)(10)(C). While some of the factors set forth in In re Rock are present, others may not be. While the Debtor's entitlement to the severance payment is linked to his "final base rate of pay, for the period of thirty-eight (38) weeks

18

following the Separation Date," this Court has no evidence (as opposed to unsubstantiated statements by counsel) as to the following:

> 1) the Debtor's job description at Commonwealth Wine & Spirits LLC;
> 2) the length of the Debtor's employment at Commonwealth Wine & Spirits LLC;
> 3) whether the Debtor was or was not offered employment with Martignetti Companies on June 17, 2009;
> 4) whether employees similarly situated to the Debtor received the same offer calculated the same way as the Debtor's severance pay was calculated; and
> 5) the reason the letter, which is dated July 22, 2009, references an employment offer from Martignetti Companies made on June 17, 2009, when the letter also provides that the Debtor was to sign, date and return it no later than June 30, 2009, which the Debtor did on June 15, 2009.

Gonsalves, 2010 WL 716185 at *6.[4]  The Court added:

> Except for the decision in In re Rock, which carves out a limited exception, the case law discussed above is far from favorable to the Debtor, although, for example, In re Bartholomew was decided under Ohio law.  In view of the Debtor's loss of employment and the present unemployment rate in the Commonwealth of Massachusetts, the Court finds that the decision in Rock strikes a compelling balance, although the Court also agrees with the Illinois bankruptcy court that the issue of whether severance can constitute an "unemployment benefit" must be determined on a case-by-case basis.

Id. at *7.

The evidence adduced at trial enables the Court to easily answer the first four questions posed in its earlier decision.  The Court has found that the Debtor was a CDL driver who was employed by Commonwealth for approximately 16 years.  Although Martignetti offered the Debtor and other CDL drivers employment, the Court finds that the

---

[4] The copy of the letter introduced into evidence was signed by the Debtor on June 26, 2009.

19

Debtor's interpretation of what transpired on June 17th was not devoid of credibility. The Debtor could have been confused about what Martignetti was offering and, accordingly, justified in determining that accepting the severance payments in lieu of what he thought was a part-time position was the right thing to do, particularly in view of disadvantages associated with loss of seniority. Notably, none of the other CDL drivers accepted employment with Martignetti either. The reduction in pay, the loss of all seniority, and the potentially short work week presumably presented overwhelming hurdles to the Debtor and the other CDL drivers when coupled with Martignetti's decision not to present him or the other CDL drivers with formal or written offers on June 17th.

The Court also observes that all similarly situated employees were provided with the same severance package. With respect to the last question, the parties agreed that the date of July 22, 2009 on the severance agreement letter was erroneous and the date should have been June 22, 2009.

Based upon the weight of the evidence and the language of section 522(d)(10), as well as the purpose of the statute, and the policy of construing exemptions liberally in favor of the debtors, the Court concludes that the severance package offered the Debtor was a payment under a contract on account of length of service for purposes of § 522(d)(10)(E), or, alternatively, in the nature of an unemployment benefit for purposes of § 522(d)(10)(C). That said, the Court concludes that only those payments that the Debtor had a "right to receive" at the commencement of the case can be deemed exempt

## VI. CONCLUSION

In view of the evidence presented which established a close similarity between the facts in the instant case and those present in <u>In re Rock</u>, the Court overrules the Trustee's Objection and grants the Debtor's Motion.  The Court finds that the Trustee waived the argument that severance payments received by the Debtor prepetition were not exempt, as well as the argument that the amount of the severance payments that the Debtor had the right to receive at the commencement of his case were not reasonably necessary for his support or that of his dependents.  Thus, the Debtor is entitled to exempt those severance payments he had a right to receive at the commencement of his case under 11 U.S.C. § 522(d)(10)(C) and (E).

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: December 21, 2010